# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

BERNAL WARD,                           :

      Plaintiff,                     :

vs.                                    :          CA 16-0616-MU

NANCY A. BERRYHILL,                    :
Acting Commissioner of Social Security,
                                       :
      Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for a period of disability, disability insurance benefits, and supplemental security income. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 17 & 18 ("In accordance with provisions of 28 U.S.C. §636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States magistrate judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.")). Upon consideration of the administrative record, Plaintiff's brief, and the Commissioner's brief,[1] it is determined that the Commissioner's decision denying benefits should be affirmed.[2]

---

[1]      The parties waived oral argument. (*Compare* Doc. 25 *with* Doc. 26).

[2]      Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 17 & 18 ("An appeal from a
(Continued)

# I. Procedural Background

Plaintiff filed an application for a period of disability and disability insurance benefits on October 31, 2013, and that same day filed an application for supplemental security income. Both applications alleged disability beginning on June 5, 2013. (*See* Tr. 131-43). Ward's claims were initially denied on January 24, 2014 (Tr. 79-85) and, following Plaintiff's written request for a hearing before an Administrative Law Judge ("ALJ") (*see* Tr. 86), a hearing was conducted before an ALJ on February 25, 2015 (Tr. 39-62). On July 13, 2015, the ALJ issued a decision finding that the claimant was not disabled and, therefore, not entitled to a period of disability and disability insurance benefits. (Tr. 23-32). More specifically, the ALJ concluded that Ward retains the residual functional capacity to perform a limited range of light work and, therefore, is capable of performing those jobs identified by the vocational expert ("VE") during the administrative hearing. (*See id.* at 27-32; *compare id. with* Tr. 56-60 (vocational expert's hearing testimony that based on the hypothetical posed, consistent with the ALJ's ultimate RFC determination, the claimant would be capable of performing those light jobs identified)). On August 25, 2015, the Plaintiff appealed the ALJ's unfavorable decision to the Appeals Council (Tr. 16-19) and, the Appeals Council denied Ward's request for review on October 27, 2016 (Tr. 1-3). In the decision denying review, the Appeals Council clearly indicated that it was denying Plaintiff's claims for both disability insurance

---

judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.")).

benefits and supplemental security income (*see id.* at 3). Thus, the hearing decision became the final decision of the Commissioner of Social Security.

Plaintiff alleges disability due to chronic congestive heart failure, cardiomyopathy, hypertension, cervical disc protrusion, lumbago, osteoarthritis, fibromyalgia, headaches, obesity, depression, and anxiety. The ALJ made the following relevant findings:

**1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.**

**2.      The claimant has not engaged in substantial gainful activity since June 5, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).**

**3.      The claimant has the following severe impairments: chronic systolic congestive heart failure, cardiomyopathy, hypertension, cervical disc protrusion, lumbago, osteoarthritis, fibromyalgia, headache, obesity, depression and anxiety (20 CFR 404.1520(c)).**

.      .      .

**4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

.      .      .

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every four months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. The claimant provides care and supervision for a minor child. She cares for her

personal needs without assistance. The claimant prepares frozen dinners and sandwiches. She does laundry, irons, and [performs] household chores over the course of 2-3 days. The claimant drives, and shops for food, clothing, and household necessities once per month.

In social functioning, the claimant has mild difficulties. The claimant spends time with her family and attends church services weekly.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant can maintain a household budget by paying bills and handling a savings account, checkbook, or money orders. She reported difficulty completing tasks, but states she could follow written and spoken instructions "good". Notes from Cahaba Mental Health Center in 2014 showed treatment for depression and anxiety. She denied side effects due to her medications. The claimant indicated she was taking 16 hours of classes, and had stable mood.

As for the episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The claimant has not required inpatient care due to a psychiatric impairment.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

.          .          .

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally operate hand and foot controls with the left upper and lower extremities, and occasionally reach overhead with the left upper extremity. She can occasionally climb ramps and stairs, but never climb ladders and scaffolds. The**

**claimant can occasionally stoop, kneel, crouch and crawl. She should never work at unprotected heights or with moving mechanical parts. She is limited to simple tasks, and can tolerate few gradually introduced changes in a routine work setting. The claimant can tolerate ordinary work pressures, but should avoid excessive workloads, rapid changes, and multiple demands.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant testified that she stopped working in June 2013, and withdrew from school in September 2014 due to fibromyalgia. She reported pain in the neck, back and arms, and rated the pain an 8 on a scale of 0-10. The claimant described low back pain that radiates down the left leg. She can walk for 100 feet, stand for 15-20 minutes, and sit for 20-30 minutes. The claimant lies down for 3-4 hours each day. Her medications cause drowsiness. The claimant reported panic attacks that last three minutes, and depressive symptoms. She described chest pain that radiates down the left arm, and numbness in her legs. The claimant does household chores and shops for groceries with her children. She prepares sandwiches or microwave meals.

The longitudinal medical evidence of record does not fully support the claimant's allegation of disability. Magnetic resonance imaging (MRI) of the lumbar spine in September 2012 did not show degenerative disc disease or neural impingement. Nerve conduction studies (NCS) of the bilateral lower extremities were normal. Physical exam in March 2013 by Dr. Ronnie Chu showed normal gait and station. The claimant moved all extremities well, and had full range of motion. She was treated with Flexeril and Toradol for pain. The claimant was diagnosed with lumbago, and referred to physical therapy. In July 2013, Dr. Chu indicated the claimant's back pain was not improving with physical therapy. MRI of the cervical, thoracic, and lumbar spine in July 2013 was normal.

Records from Dr. Hector Caballero in February 2013 indicated that the claimant's headaches were partially controlled with Cymbalta. She also reported back pain that radiated into the lower extremities, but there was no objective evidence of lumbosacral stenosis or radiculopathy. Physical exam showed decreased range of motion of the lumbar spine.

With regard to her cardiac impairments, the claimant was admitted to Hale County Hospital in June 2012 with left sided upper extremity numbness. Notes indicated borderline cardiomyopathy. There were no signs of an acute myocardial infarction. The claimant was diagnosed with hypertension, chest pain, and mitral valve prolapse per history. Records in September 2014 indicated hypertension was mild, and controlled with low dose therapy.

Echocardiogram in April 2014 showed mild global left ventricular dysfunction with left ejection fraction of 45%. Mild right ventricular hypokinesis was also noted. In May 2014, the claimant was diagnosed with stage I congestive heart failure and referred to cardiology for management. Notes in August 2014 from Dr. Steven Allyn, the claimant's cardiologist, indicated that clinically, the claimant was doing well. There was no need for statin therapy. She was diagnosed with NYHA class II. Class II symptoms include slight limitation of physical activity, but comfortable at rest. Ordinary physical activity results in fatigue, palpitation, and dyspnea (shortness of breath). The claimant returned to Dr. Allyn in February 2015 for a six-month follow up. The claimant reported chest pain unrelated to activity. She denied exertional dyspnea.

Records from Dr. [Glenton W. Davis] in October 2013 showed a diagnosis of fibromyalgia. The claimant was prescribed Ultram and Lyrica for her symptoms. In November 2013, the claimant rated her pain a 3-4. The claimant reported pain in the low back and knees during physical exam. Records from Amy Atkins, ARNP in May 2014 from the Clinic for Rheumatic Diseases showed a slightly elevated sedimentation rate and

low vitamin D levels. Musculoskeletal examination was normal. Physical exam in 2015 showed tenderness and pain with range of motion of the cervical spine, and tenderness in the lumbar spine. The claimant had normal range of motion in the hands, wrists, elbows, knees, and ankles.

Notes from Cahaba Mental Health Center in 2014 showed treatment for depression and anxiety. The claimant presented in [] September 2014 with euthymic mood and full affect. She denied side effects due to her medications. The claimant indicated she was taking 16 hours of classes, and had stable mood and appetite within normal limits. Insight and judgment were fair. The claimant reported anxiety about her disability hearing in December 2014 and February 2015. Individual therapy focused on situational stressors.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

In terms of the claimant's alleged limitations, the undersigned finds the claimant's hearing testimony less than fully credible. The claimant testified to headaches, but records from Dr. Caballero in February 2013 indicated that the claimant's headaches were partially controlled with Cymbalta. Although there is a diagnosis of cardiomyopathy, it is described as borderline. MRI of the cervical, thoracic, and lumbar spine in July 2013 was normal. Records from Dr. Allyn, the claimant's cardiologist, classify her heart condition as Class II. In August 2014, Dr. Allyn noted that the claimant was doing well, and there was no indication for statin therapy. The claimant reported numbness in the lower extremities, but nerve conduction studies in July 2014 did not show evidence of lumbar radiculopathy or peripheral neuropathy. The claimant was diagnosed with depression and anxiety, but records attribute her symptoms to situational stressors, including her disability hearing and son's recent unemployment. The claimant's last treatment note in January 2015 indicated follow-up in 4-5 months. The length of time indicated suggests the claimant's impairments are not so critical as to require frequent monitoring. Despite her impairments, the claimant is able to prepare simple meals, do light household chores, shop for groceries and [perform] household necessities, drive, attend church services regularly, and[,] until September 2014, attend vocational classes. The claimant's activities of daily living are commensurate with a range of light work activity.

As for the opinion evidence, the undersigned gives significant but not great weight to the psychological portion (Dr. Gloria Roque) of the January

2014 State agency Disability Determination Explanation indicating mild to moderate mental limitations. Findings are consistent with treatment notes from Cahaba Mental Health and the claimant's level of functioning, illustrated by her activities of daily living. Dr. Roque found mild limitations in restriction of activities of daily living and difficulties in maintaining concentration, persistence or pace and none in repeated episodes of decompensation. She stated that the claimant should be able to carry out short, simple one and two step job instructions, but should avoid excessive workloads, rapid changes and multiple demands. The claimant would benefit from a slowed pace but would still be able to maintain an acceptably consistent work pace. Changes in routine job duties should be limited and introduced gradually. Records since that time show an improvement in her condition as notes from Cahaba Mental Health Center [indicate] the claimant presented in [] September 2014 with euthymic mood and full affect. She denied side effects due to her medications. The claimant indicated she was taking 16 hours of classes, and had stable mood and appetite within normal limits.

The undersigned gives little weight to the January 2015 opinion of Dr. Davis that the claimant is disabled. Opinions on some issues, such as statements that a claimant is "disabled," "unable to work," or "unable to perform a past job," are not medical opinions but are administrative findings that are dispositive of a case. These opinions require familiarity with the Social Security disability regulations and legal standards, and are issues reserved for the Commissioner of Social Security.

Furthermore, Dr. Davis' opinion is inconsistent with the findings of Dr. Allyn, the claimant's treating cardiologist, who indicates she is doing well. Although the claimant reports pain[,] during follow[-]up visits with Dr. Davis, examinations do not show significant objective findings. Exams with Dr. Davis generally describe her as stable. On November 6, 2013, the claimant described her pain as 3-5 on a scale of 0-10, which shows some management with treatment. For these reasons, the opinion relating the claimant's employment disposition is neither controlling nor persuasive. More consideration is given to Dr. Allyn as he is a specialist and treating physician, and provides assessments that are consistent with his examination findings and the evidence of record as a whole.

In sum, the above residual functional capacity assessment is supported by evidence of record as a whole. Consideration has been given to all evidence of record, as noted above. All limitations consistent [with] the evidence of record as a whole have been accounted for in the residual functional capacity assessment.

**6.     The claimant is unable to perform past relevant work (20 CFR 404.1565).**

.     .     .

**7.     The claimant was born on May 29, 1974 and was 39 years old,
which is defined as a younger individual age 18-49, on the alleged
disability onset date (20 CFR 404.1563).**


**8.     The claimant has a limited education and is able to
communicate in English (20 CFR 404.1564).**
**9.     Transferability of job skills is not material to the determination
of disability because using the Medical-Vocational Rules as a
framework supports a finding that the claimant is "not disabled,"
whether or not the claimant has transferable job skills (See SSR 82-
41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.     Considering the claimant's age, education, work experience,
and residual functional capacity, there are jobs that exist in
significant numbers in the national economy that the claimant can
perform (20 CFR 404.1569 and 404.1569(a)).**

.     .     .

If the claimant had the residual functional capacity to perform the full
range of light work, a finding of "not disabled" would be directed by
Medical-Vocational Rule 202.18. However, the claimant's ability to perform
all or substantially all of the requirements of this level of work has been
impeded by additional limitations. To determine the extent to which these
limitations erode the unskilled light occupational base, the Administrative
Law Judge asked the vocational expert whether jobs exist in the national
economy for an individual with the claimant's age, education, work
experience, and residual functional capacity. The vocational expert
testified that given all of these factors the individual would be able to
perform the requirements of representative occupations such as: ticket
taker (DOT# 344.667-010) light work, SVP 2, with 1,000 jobs in the local
economy and 22,000 nationwide; garment sorter (DOT# 222.687-014)
light work, SVP 2, with 840 jobs in the local economy and 54,000
nationwide; and office helper (DOT# 239.567-010) light work, SVP 2, with
840 jobs in the local economy and 24,000 nationwide.

Pursuant to SSR 00-4p, the undersigned has determined that the
vocational expert's testimony is consistent with the information contained
in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned
concludes that, considering the claimant's age, education, work

experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11.    The claimant has not ben under a disability, as defined in the Social Security Act, from June 5, 2013, through the date of this decision (20 CFR 404.1520(g)).**

(Tr. 25, 26, 27, 27-30, 30, 31 & 32 (most internal citations omitted)).

## II. Standard of Review and Claims on Appeal

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation

> to determine whether the claimant is disabled, which considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the RFC to perform h[is] past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Commissioner of Social Sec.*, 457 Fed. Appx. 868, 870 (11th Cir. Feb. 9, 2012)[3] (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden, at the fourth step, of proving that she is unable to perform her previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors:  (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. *Id.* at 1005. Although "a claimant bears the burden of demonstrating an inability to return to her  past relevant work, the [Commissioner of Social Security] has an obligation to

---

[3]    "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted). If a plaintiff proves that she cannot do her past relevant work, as here, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given her age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Phillips, supra,* 357 F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny Ward benefits, on the basis that she can perform those light jobs identified by the vocational expert during the administrative hearing, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[4] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if

---

[4]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Commissioner of Social Sec.*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, Ward asserts two reasons the Commissioner's decision to deny her benefits is in error (*i.e.,* not supported by substantial evidence): (1) the ALJ erred in rejecting the opinion of the treating physician, Dr. Glenton W. Davis; and (2) the ALJ erred in misrepresenting the opinion of the treating psychiatrist.

**A.    Opinion of Plaintiff's Treating Physician, Dr. Glenton W. Davis**.    On January 26, 2015, Dr. Davis wrote a letter to Plaintiff's attorney wherein he stated Ward was "disabled[]" and, in support thereof, referred to the attached physical capacity examination form he completed on January 25, 2015. (Tr. 741; *see also id.* ("She has diagnoses of fibromyalgia, congestive heart failure, stage III[,] and cardiomyopathy.")). Indeed, Davis completed not only the Physical Medical Source Statement ("PCE") referenced in his letter, but, as well, a Clinical Assessment of Pain ("CAP") form. (Tr. 742-43.) On the PCE, Davis check-marked or circled findings indicating that Ward would be unable to perform even sedentary work. (Tr. 742 (findings indicate Ward can only sit and stand or walk one hour each out of an 8-hour workday, can lift only 5 pounds occasionally and one pound frequently, and would miss more than three days of work per month because of her impairments)). On the CAP, Davis circled items to indicate that: (1) pain is present to such an extent as to be distracting to adequate performance of daily activities; (2) physical activity—such as walking, standing, bending, lifting, etc.—would greatly increase Plaintiff's pain so as to cause distraction from or total abandonment of task; (3) some medication side effects can be expected but these side effects will be only mildly troublesome to Plaintiff; (4) Plaintiff's medical condition

could reasonably be expected to produce the pain complained of; and (5) Plaintiff's pain prevents her from maintaining concentration, attention, and pace for periods of at least two hours. (Tr. 743.)

The law in this Circuit is clear that an ALJ "'must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error.'" *Nyberg v. Commissioner of Social Sec.,* 179 Fed.Appx. 589, 590-591 (11th Cir. May 2, 2006) (unpublished), quoting *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986) (other citations omitted). In other words, "the ALJ must give the opinion of the treating physician 'substantial or considerable weight unless "good cause" is shown to the contrary.'" *Williams v. Astrue,* 2014 WL 185258, *6 (N.D. Ala. Jan. 15, 2014), quoting *Phillips, supra,* 357 F.3d at 1240 (other citation omitted); *see Nyberg, supra,* 179 Fed.Appx. at 591 (citing to same language from *Crawford v. Commissioner of Social Security,* 363 F.3d 1155, 1159 (11th Cir. 2004)).

> Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). Where the ALJ articulate[s] specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. *Moore* [*v. Barnhart*], 405 F.3d [1208,] 1212 [(11th Cir. 2005)].

*Gilabert v. Commissioner of Social Sec.*, 396 Fed.Appx. 652, 655 (11th Cir. Sept. 21, 2010) (per curiam).

In this case, the ALJ accorded little weight to Dr. Davis' January 2015 opinion (Tr. 30).

> The undersigned gives little weight to the January 2015 opinion of Dr. Davis that the claimant is disabled. Opinions on some issues, such as statements that a claimant is "disabled," "unable to work," or "unable to

perform a past job," are not medical opinions but are administrative findings that are dispositive of a case. These opinions require familiarity with the Social Security disability regulations and legal standards, and are issues reserved for the Commissioner of Social Security.

Furthermore, Dr. Davis' opinion is inconsistent with the findings of Dr. Allyn, the claimant's treating cardiologist, who indicates she is doing well. Although the claimant reports pain[,] during follow[-]up visits with Dr. Davis, examinations do not show significant objective findings. Exams with Dr. Davis generally describe her as stable. On November 6, 2013, the claimant described her pain as 3-5 on a scale of 0-10, which shows some management with treatment. For these reasons, the opinion relating the claimant's employment disposition is neither controlling nor persuasive. More consideration is given to Dr. Allyn as he is a specialist and treating physician, and provides assessments that are consistent with his examination findings and the evidence of record as a whole.

(*Id.*)  Plaintiff argues that the ALJ, in according little weight to Dr. Davis' opinion, ignored the treating physician's "detailed statements of limitations, errantly relied on evidence that predated the alleged onset of disability, and improperly gave more weight to the opinion of the treating cardiologist, who did not treat most of her impairments." (Doc. 15, at 5; *see also id.* at 5-9.)

Initially, the undersigned cannot agree with the Plaintiff's statement that the ALJ "ignored" Dr. Davis' "detailed statements of limitations[,]" both because Dr. Davis "tied" his conclusory statement that Plaintiff was disabled to the limitations set forth on the PCE (*compare* Tr. 741 *with* Tr. 742)[5] and because, far from being "detailed statements of limitations[,]"  the check-a-box/circle-the-answer forms utilized by Dr. Davis are conclusory/uninformative, *see Putnam v. Colvin,* 2015 WL 12856460, *4 (M.D. Fla. Feb. 4, 2015) ("Dr. Torres's October 16, 2008 Medical Source Statement did contain mostly

---

[5]        In other words, because Dr. Davis clearly "tied" his conclusory statement of disability to the findings on the PCE, it was not necessary for the ALJ to separately delineate the PCE limitations in order to convey to the reader that she was evaluating Davis' opinion as a whole.

form checkmarks as opposed to detailed explanations of the Plaintiff's limitations, and the ALJ was entitled to discount its probative value where it failed to reference any objective clinical and laboratory findings."), and constitute "weak evidence at best." *Mason v. Shalala,* 994 F.2d 1058, 1065 (3rd Cir. 1993). In addition, it is clear to this Court that the second paragraph of analysis is directed at those very limitations noted by Dr. Davis; therefore, the ALJ certainly did not ignore Davis' forms or the limitations described on them.

The ALJ, of course, in the first paragraph of her analysis of Dr. Davis' opinion, correctly afforded little weight to the treating physician's conclusory letter statement that Ward is "disabled" (*see* Tr. 741; *compare id. with* Tr. 30), inasmuch as the determination of disability is reserved for the Commissioner. Dr. Davis' statement is not a medical opinion and, therefore, is not entitled to be given any significance. *Compare Kelly v. Commissioner of Social Sec.,* 401 Fed.Appx. 403, 407 (11th Cir. Oct. 21, 2010) ("A doctor's opinion on a dispositive issue reserved for the Commissioner, such as whether the claimant is 'disabled' or 'unable to work,' is not considered a medical opinion and is not given any special significance, even if offered by a treating source[.]") *with Symonds v. Astrue,* 448 Fed.Appx. 10, 13 (11th Cir. Oct. 31, 2011) ("[T]he ultimate issue of disability is left to the determination of the Commissioner; and a statement by a medical source that a claimant is 'disabled' or 'unable to work' is not binding on the ALJ.").[6] And,

---

[6]    In her brief, Plaintiff makes no argument to the contrary. (*See* Doc. 15, at 6-7 ("The second mention of Dr. Davis was in the ALJ's explanation that she gave his opinion little weight. 'Opinions on some issues, such as statements that a claimant is 'disabled,' 'unable to work,' or 'unable to perform a past job,' are not medical opinions but are administrative findings that are dispositive of a case.' (Tr. 30). This reference could be appropriate in regard to the letter Dr. Davis wrote on January 26, 2015, but not in regard to the detailed assessment forms completed by Dr. Davis on January [2]5, 2015.")).

again, because Dr. Davis "tied" his letter statement of "disability" to the limitations contained on the PCE, the ALJ did not err in any manner in simply continuing his analysis of Davis' opinion, as reflected on the PCE and the CAP, without specifically delineating the "limitations" check-marked or circled by Davis. And, here, of course, the ALJ found the "checked" and "circled" statements/limitations in the PCE and CAP to be inconsistent with Dr. Davis' own exam findings and the other medical evidence and treatment of record (*see* Tr. 30 (specifically noting the inconsistency in Dr. Davis' opinion and that of Dr. Allyn and noting that the treating physician's opinion was inconsistent with his own lack of significant objective examination findings and descriptions of Plaintiff as stable, as well as Plaintiff's own report on November 6, 2013, that her pain was not disabling)), thereby making it clear that the ALJ followed the appropriate standard, *see Gilabert, supra,* 396 Fed.Appx. at 655. Thus, the only remaining question is whether this second portion of the ALJ's analysis of Dr. Davis' opinion is supported by substantial evidence.

The undersigned finds that the ALJ's analysis of Dr. Davis' opinion is supported by substantial record evidence. Before his January 2015 opinion, Dr. Davis last conducted an examination of Plaintiff on December 15, 2014 (*compare* Tr. 741-43 *with* Tr. 745), at which time he objectively observed that she was in no acute distress, her cardiovascular examination was normal, and her extremities were stable. (Tr. 745). More often than not in the eleven months prior to December 15, 2014, Dr. Davis recorded objective examination findings similar to those made during the December treatment note (*see* Tr. 594 (on May 20, 2014, cardiovascular exam was normal and extremities were noted to be stable); Tr. 595-96 & 598 (on January 8, 2014, March 25,

2014, and April 8, 2014, Plaintiff was in no acute distress, her cardiovascular exam was normal and extremities were noted to be stable); Tr. 746 (on November 3, 2014, cardiovascular exam was normal and extremities were noted to be stable); Tr. 749 (on August 25, 2014, Dr. Davis made the exact same objective examination findings as he did on December 15, 2014); Tr. 750 (on July 15, 2014, Davis' objective findings included that Ward's cardiovascular exam was normal and that her extremities were stable)), although on three occasions the treating physician noted abnormal clinical findings (Tr. 597 (on February 28, 2014, Davis noted a normal cardiovascular exam and stable extremities but also that examination of the neck revealed a 1+ spasm)) or otherwise observed pain (Tr. 747 (on October 27, 2014, Davis noted a normal cardiovascular exam but "[p]ain of the legs radiating to the lower extremities.")) or trigger point tenderness (Tr. 748 (on September 10, 2014, Davis noted Plaintiff to be in no acute distress, a normal cardiovascular examination, but a musculoskeletal "exam with trigger pain tenderness throughout.")). These objective observations from Davis, which are consistent with the treating physician's examination observations in 2013 (*see* Tr. 509 (on October 2, 2013, Davis noted that his "[w]ork up showed fibromyalgia[]" but also that the MRI results were normal and that Plaintiff was in no acute distress on examination); Tr. 510 (on August 28, 2013, cardiovascular examination was normal and Ward's extremities were stable); Tr. 511 (on July 31, 2013, cardiovascular examination was normal and Ward's extremities were stable); Tr. 512 (on June 26, 2013, Plaintiff was observed to be in no acute distress, her cardiovascular exam was normal, and her extremities were stable)), simply are not reflective of the significant limitations set forth in Dr. Davis' January 2015 opinion—both with respect to physical limitations and pain

limitations—and, therefore, the Court concludes that the ALJ did not err in her determination that Dr. Davis' own medical records do not support his January 2015 opinion. *See Gilabert, supra,* 396 Fed.Appx. at 655 (good cause exists to accord less than substantial or considerable weight to a treating physician's opinion where that opinion is inconsistent with the doctor's own medical records).[7] Indeed, as in *Putnam, supra,* at *4, the ALJ in this case did not err in discounting the probative value of Davis' PCE and CAP because both forms consisted entirely of checkmarks or circles without referencing any objective clinical and laboratory findings. *See id.*

The undersigned also cannot fault the ALJ for affording more weight to the findings of Dr. Allyn, the treating cardiologist, over those of Dr. Davis, on the basis that Allyn's assessment that Plaintiff was "doing well" was consistent with his own examination findings and the evidence of record as a whole. After all, in his cover letter dated January 26, 2015, Davis made clear that he completed the PCE (in particular) having in mind Ward's diagnoses of fibromyalgia, congestive heart failure and cardiomyopathy (Tr. 741). Therefore, the limitations imposed by Dr. Davis were excessive to the extent he intended to link those limitations to Plaintiff's congestive heart failure and cardiomyopathy (*compare* Tr. 741 *with* Tr. 742), given not only the

---

[7]     To the extent Plaintiff tries to explain what Dr. Davis meant by "stable" (*see* Doc. 15, at 7 (noting that Davis' use of the word stable "simply refers to a lack of change, either better or worse. Stable . . . extremities [is] irrelevant to the presence of fibromyalgia, neck pain, back pain, depression or headaches.")), this Court cannot agree with her argument because Davis showed himself capable, for instance, of identifying trigger point tenderness, as a result of fibromyalgia, when it existed and certainly would have consistently emphasized Plaintiff's fibromyalgia pain, if she was in such pain, as opposed to the numerous notations that Plaintiff was in no acute distress. In addition, the Court finds that this argument is an attempt to shift the Court's focus entirely to diagnoses, as opposed to clinical and laboratory findings indicative of limitations, which is unhelpful since diagnoses or "the mere existence of [] impairments does not reveal the extent to which they limit [Plaintiff's] ability to work or undermine the ALJ's determination in that regard." *Moore v. Barnhart,* 405 F.3d 1208, 1213 n.6 (11th Cir. 2005).

records of the treating cardiologist (*see* Tr. 651-59), particularly from August 7, 2014 when Allyn noted that Ward was "doing well" from a clinical standpoint (Tr. 652), but, as well, Davis' own records, which consistently describe normal cardiovascular examinations (*see, e.g.,* Tr. 510-12, 594-99 & 745-49). And while Dr. Allyn admittedly did not treat Plaintiff's fibromyalgia, he was aware of this diagnosis (Tr. 651 & 654) and consistently noted on physical examination that Plaintiff was in no acute distress, had a normal gait, and had no edema of the extremities (*see id.*). When this evidence from Dr. Allyn is combined with the all but nonexistent objective clinical findings from Dr. Davis (*see* Tr. 509-12, 594-98 & 745-50) and the majority of the remaining objective medical evidence of record (*see, e.g.,* Tr. 555-56 (Tr. 633-34 (five x-ray views of the C-Spine on June 26, 2013 were normal); Tr. 606-07 (March 28, 2014 MRI of the L-Spine revealed no focal disc protrusion, spinal stenosis, or other significant arthritic change); Tr. 635-36 (five x-ray views of the L-Spine on June 26, 2013 revealed no acute abnormality, only mild diffuse degenerative changes in the lower lumbar spine); Tr. 637-38 (February 28, 2014 x-rays of the C-Spine revealed no significant plain film abnormality and no significant change when compared to the films from June of 2013); Tr. 640-41 (February 28, 2014 x-rays of the L-Spine revealed a mild anterior osteophyte formation in the upper and lower lumbar levels but no gross posterior osteophytes or pathologic narrowing of disc spaces; there was not significant-appearing plain film abnormality of the lumbar spine and no significant change when compared to the films from June of 2013); Tr. 677-78 (September 8, 2014 visit to the emergency room, where Plaintiff's complaints included neck and back pain and physical examination revealed that she was in no acute distress, her back was normal on inspection, and her extremities were

non-tender, with full range of motion and no pedal edema); Tr.751-52 (October 30, 2014 MRI of the L-Spine was normal, showing no disc protrusions, spinal stenosis or neural foramen stenosis) & Tr. 754-58 (July 23, 2014 Nerve Conduction Studies were within normal limits, in particular, there was no evidence of lumbar radiculopathy and peripheral neuropathy involving LE's)),[8] this Court can find neither that the ALJ erred in affording more weight to Dr. Allyn's assessment over the opinion of Dr. Davis or that there is any record support for the significant limitations imposed by Dr. Davis on January 25, 2015.

Based on the foregoing, the undersigned finds no error in the ALJ's evaluation of the conclusory opinion Dr. Davis expressed in his January 26, 2015 letter or her evaluation of the uninformative form reports completed by Dr. Davis on January 25, 2015.

### B.    Did the ALJ Misrepresent the Opinion of the Treating Psychiatrist?

Plaintiff next contends that the ALJ reversibly erred in misrepresenting the opinion of the treating psychiatrist by making the following statement: "The claimant's last treatment note in January 2015 indicated follow up in 4-5 months. The length of time indicated suggests the claimant's impairments are not so critical as to require frequent

---

[8]        Plaintiff argues that the ALJ erroneously addressed medical records in her decision that predate the disability onset date of June 5, 2013. (Doc. 15, at 7 (referencing the ALJ's specific citation to a lumbar MRI in September 2012, an examination in March 2013, and a neurological examination in February 2013)). Even if this Court were to agree that the ALJ should not have relied on any evidence dated prior to June 5, 2013 to support her ultimate determination that Plaintiff is not disabled, such error was harmless inasmuch as there is similar evidence in the record postdating the onset date of disability that likewise supports the ALJ's conclusion that the "longitudinal medical evidence of record does not fully support the claimant's allegation of disability." (Tr. 28.) Indeed, there are numerous MRI and x-ray records postdating June 5, 2013 that reveal no significant findings with respect to Plaintiff's C-Spine and L-Spine; instead, these records reveal, at best, mild degenerative changes. (*See, e.g.,* Tr. 555-56, 606-07, 635-38, 640-41 & 751-52; *cf.* Tr. 754-58 (normal Nerve Conduction Studies)).

monitoring." (Tr. 29 (internal citation omitted)). Plaintiff points out in her brief both that the treatment note from January 2015 was not the last treatment note in the record (Doc. 15, at 10 (referencing a treatment note dated February 17, 2015)), such that the ALJ ignored this last treatment note, but, as well, that the ALJ performed only a cursory review of the mental health notes (*see* Doc. 15, at 11). Plaintiff contends that the ALJ's failure to acknowledge the therapy note dated after January 2015, when combined with her cursory review of the other mental health notes, amounts to reversible error, given that "[t]he ALJ must state with particularity the weight accorded 'to each item of evidence[.]'" (Doc. 15, at 11, quoting *Randolph v. Astrue,* 291 Fed.Appx. 979, 981 (11th Cir. Sept. 10, 2008)).

The undersigned cannot find that the ALJ reversibly erred in her analysis of Plaintiff's mental impairments (depression and anxiety) and the mental health treatment notes of record. Initially, the undersigned notes that while the ALJ certainly referenced Plaintiff's "last treatment note in January 2015 indicated follow up in 4-5 months[,]" (Tr. 29), this reference was simply with respect to Julie Van Sice's last appointment with Ward;[9] the ALJ decidedly did not ignore the February 2015 individual therapy session note of record, as she referenced it and observed that "[i]ndividual therapy focused on situation stressors." (Tr. 29.) In addition, while the ALJ's summary of the mental health notes in the record was somewhat brief, it was not inordinately brief because the ALJ mentioned those notes both at Step 3 of the sequential evaluation process (*see* Tr. 26-27 (referencing the notes from Cahaba Mental Health Center in finding that Ward has moderate difficulties with regard to concentration, persistence and pace)) and at Steps 4

---

[9]      Sice is a psychiatric nurse practitioner. (*See, e.g.,* Tr. 616.)

and 5 of that process (*see* Tr. 29-30). Plaintiff has simply not identified what in those mental health notes from Cahaba Mental Health Center, of which there were a precious few (*see* Tr. 520-22, 611-17, 735-39 & 786-88), the ALJ failed to accord proper weight[10] and certainly has not made any suggestion, much less established, that those mental health notes demonstrate more severe mental limitations than those included by the ALJ in her RFC determination (*compare* Tr. 520-22, 611-17, 735-39 & 786-88 (no mental limitations identified) *with* Tr. 27 ("**She is limited to simple tasks, and can tolerate few gradually introduced changes in a routine work setting. The claimant can tolerate ordinary work pressures, but should avoid excessive workloads, rapid changes and multiple demands.**"[11])). Accordingly, this Court cannot find that the ALJ either misrepresented the opinion of the treating "psychiatrist,"[12] or that she

---

[10]    It is also clear Eleventh Circuit law that "'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision.'" *Randolph, supra,* 291 Fed.Appx. at 982, quoting *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005). And, here, the ALJ committed no error because there is simply nothing in the mental health records from Cahaba Mental Health Center which supports Plaintiff's position that "her mental health issues directly led to her inability to continue to attend school." (Doc. 15, at 10-11.) Indeed, while those records do contain a report by Plaintiff to Van Sice, on May 21, 2014, that school was causing her a lot of stress and she had to go to the ER due to stress and depression (Tr. 737 (report of taking 16 hours at Wallace Community College)), and a report to her therapist on September 9, 2014 that she was withdrawing from class (Tr. 739), there is no evidence in the record establishing that she withdrew from school while taking the 16 hours of classes the ALJ references in her decision (*compare* Tr. 737 *with* Tr. 29 & 30); indeed, the record establishes that Plaintiff did not withdraw from school until almost eight months later, on January 5, 2015, with her withdrawal being directly linked to her diagnosed fibromyalgia (Tr. 744).

[11]    The undersigned would simply note that the mental limitations found by the ALJ are supported by evidence in the record. (*See* Tr. 75-76 (January 24, 2014 mental RFC analysis by non-examining, reviewing psychologist reveals that Ward should be able to understand short and simple one to 2-step job instructions; tolerate ordinary work pressures but should avoid excessive workloads, rapid changes, and multiple demands; and changes in routine job duties should be limited and introduced gradually)).

[12]    The records from Cahaba Mental Health Center establish that Ward was not being treated by a psychiatrist; instead, she was being seen and treated by Sice, a psychiatric nurse practitioner. (*See, e.g.,* Tr. 616 & 737.)

improperly evaluated the mental health treatment notes from the Cahaba Mental Health Center.

There being no other claims of error asserted, the Court finds that the Commissioner's final decision denying Ward benefits is due to be affirmed.

<u>**CONCLUSION**</u>

In light of the foregoing analysis, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 6th day of September, 2017.

<u>s/P. BRADLEY MURRAY</u>
**UNITED STATES MAGISTRATE JUDGE**